**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Raygarr LLC, | No. CV-18-00246-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Employers Mutual Casualty Company, | |
| Defendant. | |

Pending before the Court are Defendant's Motion for Summary Judgment Regarding Causation, Breach of Contract and Punitive Damages (Doc. 83), Plaintiff's Motion for Partial Summary Judgment (Doc. 85), Plaintiff's Motion to Establish Prima Facie Case of Punitive Damages (Doc. 87), and Plaintiff's Motion to Postpone Summary Judgment Proceedings and to Reopen Discovery (Doc. 106). For the following reasons, Plaintiff's Motion to Postpone Summary Judgment Proceedings will be denied but Plaintiff's Motion to Reopen Discovery will be granted. Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment will be denied. Plaintiff's Motion to Establish Prima Facie Case of Punitive Damages will be granted to the extent that the Court is denying Defendant's request for summary judgment on Plaintiff's insurance bad faith and punitive damages claims and thus those claims will be in issue at trial.[1]

. . . .

---

[1] The Court finds that oral argument would not assist it in the resolution of the pending Motions and therefore resolves the Motions without oral argument.

# I.    Background[2]

On February 18, 2014, Defendant Employers Mutual Casualty Company ("EMC") issued a Commercial General Liability Policy ("Policy") and an Umbrella Policy ("Umbrella Policy") to Plaintiff Raygarr LLC ("Raygarr"), with an effective period of February 22, 2014 to February 22, 2015.  (FAC ¶¶ 4-5; Ans. ¶¶ 4-5.)  The Policy provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'" that "is caused by an 'occurrence,'" which is defined as "an accident." (Doc. 84-1 at 35, 40.)  The Policy does not cover property damage "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement" unless the insured would have had liability for the damages "in the absence of the contract or agreement" or unless the liability was assumed "in a contract or agreement that is an 'insured contract.'"  (*Id.* at 36.)  In the event of an "occurrence," the insured must notify EMC "as soon as practicable" and shall not "except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [EMC's] consent."  (*Id.* at 37.)  The Umbrella Policy covers "the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage,'" and contains the same provisions discussed above concerning contractual liability and voluntary payments.  (*Id.* at 45-48.)

In 2013 and 2014, Raygarr performed more than $5 million of work per year as a general contractor, with over 98% of its contracts being with Raytheon Missile Systems

---

[2]    Plaintiff's First Amended Complaint (Doc. 24) is cited as "FAC," and Defendant's Answer thereto (Doc. 33) is cited as "Ans."  The Statement of Facts in Support of Defendant's Motion for Summary Judgment Regarding Causation, Breach of Contract and Punitive Damages (Doc. 84) is cited as "DSOF."  Plaintiff's Controverting Statement of Facts in Opposition to Defendant's Motion for Summary Judgment (Doc. 92) is cited as "PCSOF."  Plaintiff's Statement of Facts in Support of Plaintiff's Motion for Partial Summary Judgment (Doc. 86) is cited as "PSOF."  Defendant's Controverting Statement of Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. 94) is cited as "DCSOF."  Plaintiff's Statement of Facts in Support of Motion to Establish Prima Facie Case of Punitive Damages (Doc. 88) is cited as "PPDSOF."  Exhibits and briefs are cited using the docket and page numbers generated by the Court's electronic filing system.

Company ("Raytheon").  (Doc. 84-1 at 73; Doc. 86-1 at 14.)[3]  On July 28, 2014, Raygarr signed a purchase order with Raytheon to perform as a general contractor for a bathroom renovation project in Raytheon's Building 842.  (FAC ¶ 6; *see also* Doc. 83 at 3; Doc. 84-1 at 73; Doc. 86-1 at 14.)  There appears to be no dispute that the Policy and Umbrella Policy covered Raygarr for sums Raygarr became legally obligated to pay because of property damage caused by an accident during the bathroom renovation project.  (*See, e.g.*, DSOF ¶¶ 6-7; PCSOF ¶¶ 6-7.)

During the evening of September 8-9, 2014, extensive flooding occurred in Building 842 due to the failure of a number of PVC caps installed by Raygarr's subcontractor, Qualified Mechanical Contractors ("Qualified").  (FAC ¶ 8; *see also* Doc. 83 at 3; Doc. 87 at 5.)  Raytheon informed Raygarr of the flood at 6:30 a.m. on September 9, 2014.  (PSOF ¶ 1; DCSOF ¶ 1.)  Raygarr and Raytheon immediately contacted remediation contractors Abracadabra Restoration ("Abracadabra") and ATI Restoration ("ATI") and requested a full company response from each.  (PSOF ¶ 2; DCSOF ¶ 2.)  Remediation costs for the flood damage were likely to exceed $1 million.  (PSOF ¶ 9; DCSOF ¶ 9.)  Liability for the flood damage was unclear.  (DSOF ¶ 5; PCSOF ¶ 5.)  Raytheon appeared to potentially be liable for noticing the flood during security walk-throughs but failing to take appropriate action, and Qualified appeared to potentially be liable for installing the PVC caps that had failed; in addition, Raygarr alleges that, under its contract with Raytheon, it was liable for the negligence of its subcontractors, including Qualified.  (DSOF ¶¶ 1, 5; PCSOF ¶¶ 1, 5; *see also* PPDSOF ¶¶ 76, 87.)  Raytheon represented that Raygarr, as the general contractor, was responsible for the flood incident and any remediation and repairs.  (FAC ¶ 9; Doc. 83 at 3.)

On September 9, Raygarr reported the flood to its insurance agent, Ryan Trayers ("Trayers"), and Trayers in turn contacted EMC.  (*See* PSOF ¶ 3; DCSOF ¶ 3; Doc. 86-1 at 26, 30.)  At 8:32 a.m. on September 10, EMC's senior claims adjuster Fabian Mireles ("Mireles") called Raygarr's owner, Ray Garrison ("Garrison") in response to the damage

---

[3]     These figures stem from a 2017 affidavit by Raygarr's owner and do not appear to be disputed.

claim reported by Trayers the day before. (PSOF ¶ 3; DCSOF ¶ 3.) Garrison and Mireles spoke for 31 minutes. (PSOF ¶ 4; DCSOF ¶ 4; *see also* Doc. 86-1 at 9-10.) The parties dispute what was said during the conversation. (PSOF ¶¶ 4-8, 11; DCSOF ¶¶ 4-8, 11.) According to Plaintiff, Mireles told Garrison to proceed with the remediation and consented to Raygarr entering into remediation contracts with ATI and Abracadabra. (PSOF ¶ 11; *see also, e.g.*, Doc. 86-1 at 9, 16, 26-27, 31-32, 35.) Mireles does not have a specific recollection of the conversation but averred at deposition and in an affidavit that, based on his experience and practice, he would have told Garrison not to make voluntary payments because EMC was still investigating legal liability. (Doc. 94 at 29, 37-41, 52.) Mireles further averred that he did not authorize any repairs, did not indicate that EMC would pay for mitigation or repairs, was not authorized to resolve claims in excess of $70,000 without the approval of a supervisor, and has never authorized an insured to incur a liability expense exceeding his $70,000 level of authority. (Doc. 86-2 at 3; Doc. 94 at 49, 53.) Plaintiff objects to the admissibility of Mireles's testimony.

On September 10, Raygarr signed flood remediation contracts with Abracadabra and ATI. (PSOF ¶¶ 30-31; DCSOF ¶¶ 30, 79; *see also* Doc. 86-1 at 6, 40, 42-44, 48-49.)[4] According to Plaintiff, on September 11, an independent adjuster named David Conger ("Conger"), who was retained by EMC to observe flood conditions at Building 842, told Garrison that Raygarr was going to get "f***ed" by EMC, that EMC would never pay the claim, and that Raygarr was going to get stuck with the remediation costs. (PSOF ¶¶ 12-14; *see also* Doc. 106 at 2.)[5] The parties dispute whether, after the conversation with Conger, Garrison sought and received reassurance from Mireles and Trayers that Raygarr was covered. (PSOF ¶¶ 15-18, 20-24; DCSOF ¶¶ 15-18, 20-24; *see also* Doc. 86-1 at 34-35.) Abracadabra and ATI, in conjunction with Raygarr's own staff, remediated the flood damage. (FAC ¶¶ 16, 31; Doc. 83 at 5.)

---

[4] There is conflicting evidence in the record regarding whether the ATI contract was signed at 6 a.m., prior to Garrison's conversation with Mireles, or mid-morning, after Garrison spoke to Mireles. (*See* Doc. 86-1 at 6, 48-49.)
[5] Defendant disputes these allegations and objects that Plaintiff's evidence concerning Conger's statements is inadmissible hearsay. (DCSOF ¶¶ 12-14.)

In a letter dated September 18, 2014, counsel for Raygarr claimed that Mireles consented to Raygarr entering into remediation contracts and noted that it expected EMC to pay for flood remediation costs incurred by Raygarr. (Doc. 84-1 at 27-28; Doc. 88-2 at 22-23; Doc. 94 at 62-63.) EMC litigation specialist Dan Misheck ("Misheck") responded in a letter dated September 23, advising that Raygarr's claim had been reassigned to him and that EMC's investigation of the claim showed that Garrison had contracted with ATI and Abracadabra on September 9, "the day before this claim was reported to EMC." (Doc. 84-1 at 30-31; Doc. 86-2 at 19-20; Doc. 88-2 at 27-28; Doc. 94 at 65-66.) Misheck stated in the letter that "Mr. Mireles never instructed or directed Mr. Garrison to assume such obligation," and recited the Policy's provision that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [EMC's] consent." (Doc. 84-1 at 31; Doc. 86-2 at 20; Doc. 88-2 at 28; Doc. 94 at 66.) EMC never paid Raygarr for the remediation costs it incurred, which Garrison avers caused Raytheon to terminate Raygarr as a contractor and ultimately resulted in the demise of Raygarr's business. (Doc. 84-1 at 76-77; Doc. 86-1 at 17-18)

On February 5, 2016, Raytheon sued Raygarr for damages caused by the flood in Building 842. (DSOF ¶¶ 6, 15; PCSOF ¶¶ 6, 15; Doc. 84-1 at 85-96.) EMC extended liability coverage and defended, indemnified, and settled the claims asserted by Raytheon against Raygarr, pursuant to the terms of the Policy. (DSOF ¶¶ 7, 16; PCSOF ¶¶ 7, 16.) Raygarr counterclaimed against Raytheon in the lawsuit and received a confidential settlement payment. (DSOF ¶¶ 17, 26; PCSOF ¶¶ 17, 26; Doc. 84-1 at 2-20.)

Plaintiff filed the pending action in Pima County Superior Court on April 5, 2018, and Defendant removed the action to federal court on May 11, 2018. (Doc. 1.) Plaintiff's First Amended Complaint asserts claims for (1) negligent misrepresentation, (2) promissory estoppel, (3) insurance bad faith/breach of the covenant of good faith and fair dealing ("insurance bad faith"), and (4) breach of contract, premised on allegations that EMC authorized Raygarr to incur flood remediation costs and represented that the

costs were covered by the Policy but then denied coverage for those costs. (FAC ¶¶ 10-79.) In addition to compensatory damages, Plaintiff seeks punitive damages. (*Id.* at 9.)

## II.    Plaintiff's Motion to Postpone Summary Judgment Proceedings and to Reopen Discovery

Plaintiff asks the Court to re-open discovery for the sole purpose of allowing Plaintiff to take Conger's deposition, and to defer scheduling oral argument or ruling on the pending summary judgment motions until after Conger's deposition is completed and the parties have supplemented the summary judgment record with the deposition testimony. (Doc. 106 at 1, 8.) Defendant opposes Plaintiff's request to postpone the summary judgment proceedings but agrees that discovery should be reopened to allow the parties to take Conger's deposition if this case is not dismissed on summary judgment. (Doc. 107 at 2.)

Plaintiff avers that it recently learned, by happenstance, that Conger spoke to Mireles in September 2014 and that Mireles told Conger "I guess I should not have told Ray [Garrison] that he can enter into those [remediation] contracts." (Doc. 106 at 3.) Plaintiff avers that Conger's recollection of this statement by Mireles goes to the crux of the dispute in this case, which according to Plaintiff is "whether Mireles, on behalf of EMC, authorized and consented to Raygarr entering into contracts with ATI and Abracadabra." (*Id.* at 3-4.) Plaintiff argues that deferral of summary judgment proceedings is appropriate pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, and that good cause exists to reopen discovery. (*Id.* at 5.)

In response, Defendant argues that Rule 56(d) does not apply to Plaintiff's Motion for Partial Summary Judgment, as Rule 56(d) relief is available only to nonmovants opposing a summary judgment motion. (Doc. 107 at 2.) Defendant further argues that Plaintiff's Rule 56(d) request is deficient with respect to Defendant's Motion for Summary Judgment because Plaintiff has not shown how Conger's deposition testimony could defeat that Motion. (*Id.* at 2-3.) Specifically, Defendant argues that whether Mireles told Conger that he should not have authorized Garrison to enter into remediation

contracts is irrelevant to Defendant's pending Motion for Summary Judgment because Defendant conceded that any admissible version of statements made by Mireles to Garrison can be presumed true for purposes of that Motion. (*Id.*)

In its Reply, Plaintiff argues that Conger's expected deposition testimony is relevant to its breach of contract claim and its punitive damages claim, on which Defendant seeks summary judgment. (Doc. 108 at 1-3.) Specifically, Plaintiff avers that Conger's testimony will confirm that Plaintiff complied with its contractual obligation to obtain EMC's consent prior to entering into remediation contracts. (*Id.* at 1-2.) Plaintiff further avers that the testimony will permit a reasonable inference that EMC, with knowledge that Mireles had authorized Raygarr to enter into remediation contracts, intentionally refused to honor its commitment in order to protect its own self-interest at the expense of Raygarr's interests. (*Id.* at 2.)

A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The "good cause" standard requires a showing that scheduling deadlines "cannot reasonably be met despite the diligence of the party seeking the extension." *Johnson v. Mammoth Recs. Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (internal quotation omitted). "Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification." *Id.* In determining whether to amend a scheduling order to reopen discovery, courts consider:

> 1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

*City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1066 (9th Cir. 2017) (quoting *United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1526 (9th Cir. 1995), *vacated on other grounds by* 520 U.S. 939 (1997)).

In the present case, trial is not imminent. Defendant does not specifically oppose Plaintiff's request to reopen discovery, instead only opposing the request to the extent it

seeks to reopen discovery prior to the Court's resolution of the pending summary judgment motions. Defendant does not indicate it would be prejudiced by the reopening of discovery. Further, it appears likely that Conger's deposition will lead to relevant evidence. Although the Court questions the parties' decision not to depose Conger earlier in the proceedings, it appears that Plaintiff had no reason to anticipate the particular testimony that precipitated Plaintiff's pending request to reopen discovery. Accordingly, the Court finds that Plaintiff has established good cause to modify the Court's Scheduling Order to reopen discovery for the limited purpose of allowing the parties to take Conger's deposition.

The Court next turns to the disputed issue of whether discovery should be reopened prior to the Court's resolution of the pending summary judgment motions or only in the event that this case survives Defendant's Motion for Summary Judgment. Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, the Court may defer considering a summary judgment motion if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Defendant argues that Conger's deposition testimony is not essential to justify Plaintiff's opposition to Defendant's Motion for Summary Judgment because, although Defendant disputes whether Mireles told Conger that he should not have authorized Garrison to enter into the remediation contracts, that dispute is irrelevant to Defendant's pending Motion for Summary Judgment. (Doc. 107 at 3.)

The Court agrees with Defendant that Conger's deposition testimony is not essential to justify Plaintiff's opposition to Defendant's requests for summary judgment on Plaintiff's claims for negligent misrepresentation, promissory estoppel, and insurance bad faith. With respect to each of those claims, Defendant argues that summary judgment is appropriate, regardless of whether Mireles authorized Raygarr to enter into remediation contracts. (*See* Doc. 83 at 9-13.) The Court finds that Mireles's statements to Raygarr are relevant to Defendant's requests for summary judgment on Plaintiff's breach of contract and punitive damages claims. Nevertheless, Conger's anticipated

deposition testimony is not essential to justify Plaintiff's opposition to Defendant's Motion for Summary Judgment with respect to those claims, because the current record already establishes material issues of fact precluding summary judgment on those claims. Accordingly, the Court will deny Plaintiff's request to postpone the pending summary judgment proceedings but will grant Plaintiff's request to reopen discovery for the limited purpose of allowing the parties to take Conger's deposition.

### III.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248-50 (1986); *see also Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In evaluating a motion for summary judgment, the court must "draw all reasonable inferences from the evidence" in favor of the non-movant. *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002). If "the evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to

1  trial." *Id.* "The court need consider only the cited materials, but it may consider other
2  materials in the record." Fed. R. Civ. P. 56(c)(3).

3  **IV.    Plaintiff's Motion for Partial Summary Judgment**

4         Plaintiff seeks a summary judgment ruling—for purposes of Raygarr's negligent
5  misrepresentation, breach of contract, promissory estoppel, and insurance bad faith
6  claims—that there is no genuine dispute that, in a conversation with Garrison on
7  September 10, 2014, Mireles consented to and approved of Raygarr entering into flood
8  remediation contracts. (Doc. 85 at 1-3, 13.) Plaintiff argues that the testimony of Mireles
9  and other EMC representatives, and the EMC claim file, fail to create a genuine issue of
10  material fact contesting Plaintiff's evidence on this issue. (*Id.* at 1-3.) Specifically,
11  Plaintiff argues that Mireles's testimony does not establish a genuine issue because
12  Mireles has no independent recollection of the September 10 conversation; that other
13  EMC representatives failed to adequately investigate Plaintiff's assertions about
14  Mireles's representations at a time when Mireles should have had recollection of his
15  conversations with Garrison, and that EMC never documented in writing to Raygarr or in
16  its claim file notes that it disputed Plaintiff's assertions regarding Mireles's
17  representations. (*Id.* at 7-8, 10-12.)

18         Defendant responds that there is a genuine issue of material fact regarding whether
19  Mireles consented to and approved of Raygarr entering into flood remediation contracts,
20  and that the issue is central to this case. (Doc. 93 at 2.) Specifically, Defendant notes
21  that, even though Mireles has no independent recollection of his conversations with
22  Garrison in September 2014, he directly denied during his deposition that he authorized
23  any repairs, based on his claim file notes and his routine practices. (*Id.* at 2-3, 9.)
24  Defendant argues that Mireles's testimony regarding his routine practices is admissible
25  under Federal Rule of Evidence 406. (*Id.* at 11-12.) Defendant also argues that Mireles's
26  claim file notes are admissible under hearsay exceptions and that they support a
27  reasonable inference that Mireles did not authorize or consent to Raygarr entering into
28  remediation contracts. (*Id.* at 4-6, 9-11.) Defendant avers that the testimony of its

standard-of-care expert, Steven Plitt ("Plitt")—that it is reasonable that Mireles does not have a specific memory of his conversations with Garrison and that it is highly unlikely that Mireles would have agreed that EMC would pay for the expenses incurred by Raygarr in entering remediation contracts—further supports a factual conclusion that Mireles did not consent to or approve of Raygarr entering into remediation contracts. (*Id.* at 6-7, 12-13.) Defendant also argues that, in 2016, Ray Garrison testified that Mireles did not authorize Raygarr to do remediation work and that he had no expectation that EMC would pay for the remediation expenses. (*Id.* at 7, 13.) Furthermore, a timeline created by Greg Garrison on September 11 or 12, 2014 states that Raygarr entered into one of the remediation contracts at 6:00 a.m. on September 10, 2014, before anyone from Raygarr had any communication with Mireles or anyone else at EMC. (*Id.*) Finally, Defendant argues that a 2017 affidavit by Ray Garrison shows that Raygarr entered into remediation contracts based on representations and directions from Raytheon, rather than EMC. (*Id.* at 8, 13-14.)

In its Reply, Plaintiff argues that Mireles's testimony concerning his routine practices is inadmissible because Defendant cannot prove that Mireles has a habitual response to the specific circumstances at issue in this case: handling requests by an insured to enter into remediation contracts for emergency mitigation prior to a litigation determination. (Doc. 100 at 5-7.) Plaintiff also argues that the testimony of Plitt is inadmissible, because the Federal Rules of Evidence do not permit an expert witness to testify about the credibility of other witnesses. (*Id.* at 7-11.) Plaintiff avers EMC's claim file notes do not allow a reasonable inference that Mireles did not authorize and consent to Raygarr signing the remediation contracts, because the notes confirm that Mireles was aware of the contracts and that EMC knew by September 18, 2014 at the latest that Garrison claimed Mireles authorized Raygarr to sign the contracts, and yet the claim file notes fail to dispute that Raygarr signed the contracts with Mireles's consent and approval. (*Id.* at 3-4.) Finally, Plaintiff argues that the prior testimony of the Garrisons is consistent with their testimony in this matter, as there can be more than one cause for

losses, and both Raytheon and EMC caused Raygarr damages. (*Id.* at 11.) Plaintiff does not specifically address the 2016 testimony of Garrison cited in Defendant's Response, nor does Plaintiff address the timeline created by Greg Garrison.

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). However, summary judgment evidence need not necessarily be produced "in a form that would be admissible at trial, as long as the [producing] party satisfies the requirements of Federal Rule of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). Accordingly, the Court will determine whether Defendant has identified any evidence which could be presented in an admissible form at trial and which establishes a genuine issue of material fact regarding whether Mireles authorized and consented to Raygarr entering into remediation contracts. The Court draws "all reasonable inferences from the evidence" in Defendant's favor. *O'Connor*, 311 F.3d at 1150.

### A.  Prior Testimony and Affidavits of Ray Garrison

Defendant refers to 2016 testimony by Garrison but fails to include the testimony as an exhibit to its Controverting Statement of Facts. (*See* Doc. 93 at 7; DCSOF ¶ 77.) The Court has been unable to locate the testimony in the record. Accordingly, the Court will not consider that testimony in evaluating Plaintiff's Motion for Partial Summary Judgment. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring that parties support their assertions by "citing to particular parts of materials in the record").

Defendant also relies upon an affidavit submitted by Garrison in the prior Raytheon litigation. (Doc. 93 at 8.) Garrison's averments in that affidavit, that Raytheon represented that it was liable for the flood and directed it to enter into flood remediation contracts (Doc. 84-1 at 74-79; Doc. 86-1 at 15-20; Doc. 88-1 at 5-10), are not inconsistent with Garrison's deposition testimony in this case, that he knew Raytheon would want Raygarr to remediate the flood and that he told Mireles that Raytheon would expect and appreciate him to confirm that Raygarr had coverage and could begin the

remediation efforts (Doc. 84-1 at 55-56; Doc. 88-3 at 7).  Furthermore, Garrison averred in the prior affidavit that during a long call with EMC's claim representative on September 10, 2014, "EMC told [him] to proceed with the remediation work and that there was coverage," but then failed to pay for the remediation costs incurred by Raygarr. (Doc. 84-1 at 75-76; Doc. 86-1 at 16-17; Doc. 88-1 at 6-7.)  The prior affidavits do not permit a reasonable inference that Mireles did not authorize and consent to Raygarr entering into remediation contracts.

### B.    Mireles and Plitt's Testimony

Plaintiff argues that Plitt's proposed expert testimony is inadmissible because it impermissibly opines upon the credibility of witnesses, that Mireles's testimony concerning the representations he made to Raygarr is inadmissible because it is speculative, and that Mireles's testimony concerning his routine habits is inadmissible because Defendant cannot satisfy the standard for admissibility under Federal Rule of Evidence 406.

Plitt's testimony that insurance claim adjusters develop routine practices that operate like muscle memory may be admissible at trial given proper foundation (*see* Doc. 94 at 81); however, other testimony by Plitt appears to merely bolster the credibility of Mireles's testimony and is thus likely inadmissible (*see id.* at 77-81).  *See United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985) (holding that expert testimony is inadmissible where it "in effect . . . impermissibly . . . [asks the jury] to accept an expert's determination" that particular witnesses [are] truthful," as "[c]redibility is a matter to be decided by the jury"), *overruled in part on other grounds by United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997).  Mireles's testimony that he did not authorize Raygarr to enter into remediation contracts may be inadmissible based on a lack of personal knowledge, since Mireles concedes that he has no independent recollection of his conversations with Garrison and his claim file notes are silent on the issue of whether he authorized the signing of the contracts.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has

personal knowledge of the matter."). However, Mireles's testimony concerning his routine practices may be admissible under Federal Rule of Evidence 406 given proper foundation.[6] Because other evidence in the record establishes a genuine issue of material fact necessitating the denial of Plaintiff's Motion for Partial Summary Judgment, the Court need not conclusively determine the admissibility of Plitt's and Mireles's testimony.

### C.     EMC Claim File Notes

Plaintiff does not dispute that EMC's claim file notes are admissible under hearsay exceptions, and both parties rely upon the notes in support of their positions. The notes are silent on the issue of whether Mireles authorized and consented to Raygarr entering into remediation contracts with Abracadabra and ATI. Conflicting inferences can reasonably be drawn from that silence. The notes indicate that EMC had notice of the remediation work as early as September 10, knew of the remediation contracts as early as September 11, and was aware as early as September 18 that Raygarr claimed Mireles had authorized and consented to Raygarr entering into the contracts. (*See* Doc. 94 at 54, 56, 62-63.) A reasonable juror could conclude—based on these indications of knowledge and the lack of language in the claim file notes expressly disputing Raygarr's claims regarding advance authorization—that Mireles indeed authorized Raygarr to enter into remediation contracts with Abracadabra and ATI. However, a reasonable juror could also conclude, based on the absence of any indication in the notes that Mireles authorized the signing of the remediation contracts, that Mireles did not in fact provide Raygarr with authorization to enter into the contracts.

Differing reasonable inferences can also be drawn from other language contained

---

[6]     "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." Fed. R. Evid. 406. "In deciding whether certain conduct constitutes habit, courts consider three factors: (1) the degree to which the conduct is reflexive or semi-automatic as opposed to volitional; (2) the specificity or particularity of the conduct; and (3) the regularity or numerosity of the examples of the conduct." *United States v. Angwin*, 271 F.3d 786, 799 (9th Cir. 2001), *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007). The party offering the evidence bears the "burden of establishing that certain conduct qualifies as evidence of habit." *Id.*

in the claim file notes. For example, on September 15, 2014, Mireles wrote: "Need to send letter to insured confirming we would only pay for what they are legally liable, to not make voluntary payments, and confirm subcontractor appears legally liable." (Doc. 88-2 at 14.) He also indicates that Conger "re-confirmed" with Raygarr that EMC "had not accepted liability as there is much to figure out still." (Doc. 94 at 58.) On September 16, 2014, Mireles wrote: "Discussed/re-confirmed EMC would pay for what insured is legally liable but based on investigation to date, it appears subcontractor is legally liable." (Doc. 88-2 at 16.) He also stated: "Re-confirmed I had only asked insured, given he was the general contractor on job and had qualifications, to simply prepare repair estimate for damages." (*Id.*) A reasonable juror could infer, from these comments, that Mireles did not authorize Raygarr to enter into remediation contracts and that he was trying to clarify that fact with Raygarr.

### D. Timeline Created by Greg Garrison

There appears to be no dispute that the timeline created by Greg Garrison can be presented in an admissible form at trial, as both parties rely upon it. (*See* Doc. 86-1 at 3-7; Doc. 88-1 at 44-48; Doc. 93 at 7.) The timeline establishes a genuine issue of material fact regarding whether Raygarr obtained EMC's consent and authorization prior to signing remediation contracts, as the timeline indicates that Raygarr signed the remediation contract with ATI prior to Garrison's first conversation with Mireles. (Doc. 86-1 at 6; Doc. 88-1 at 47.) A reasonable juror could, after considering the timeline, reject Garrison's testimony that Raygarr entered into remediation contracts only after obtaining Mireles's consent and authorization.

### E. Conclusion

Although some of the evidence relied upon by Defendant in its Response is likely inadmissible, Defendant has nevertheless identified sufficient evidence to establish a genuine issue of material fact on the issue of whether Mireles authorized and consented to Raygarr entering into remediation contracts with ATI and Abracadabra. Accordingly, Plaintiff's Motion for Partial Summary Judgment will be denied.

**V.  Defendant's Motion for Summary Judgment**

Defendant seeks summary judgment on all of Plaintiff's claims.  (Doc. 83 at 1, 16.)  Defendant argues that summary judgment on Plaintiff's negligent misrepresentation, promissory estoppel, and insurance bad faith claims is appropriate because Plaintiff cannot prove reliance and causation.  (*Id.* at 9-13.)  Defendant similarly argues that Plaintiff cannot establish a promissory estoppel claim because it cannot prove that it relied on any promise by Defendant to its detriment.  (*Id.* at 11-12.)  Defendant argues that Plaintiff's breach of contract claim fails because Plaintiff cannot prove causation and because there was no coverage for Plaintiff's claimed damages under the terms of the Policy and Umbrella Policy.  (*Id.* at 13-15.)  Finally, Defendant argues that Plaintiff cannot satisfy Arizona's punitive damages standard by clear and convincing evidence because there is no evidence that Defendant acted with an "evil mind."  (*Id.* at 15-16.)

For purposes of evaluating Defendant's Motion for Summary Judgment, the Court assumes that Mireles authorized Raygarr to enter into remediation contracts with Abracadabra and ATI, and that he told Garrison that the remediation expenses were covered by the Policy.  (*See* Doc. 83 at 5 n.1.)  The Court also draws "all reasonable inferences from the evidence" in Plaintiff's favor.  *O'Connor*, 311 F.3d at 1150.

**A.  Negligent Misrepresentation, Promissory Estoppel, and Insurance Bad Faith**

To establish a negligent misrepresentation claim, a plaintiff must prove:

(1) the defendant provided false information in a business transaction;
(2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely;
(3) the defendant failed to exercise reasonable care in obtaining or communicating the information;
(4) the plaintiff justifiably relied on the incorrect information; and
(5) resulting damage.

*KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 340 P.3d 405, 412 n.7 (Ariz. App. 2014).  Defendant argues that Plaintiff cannot establish elements (4) and (5) because it cannot prove that Raygarr relied on any statement by EMC in entering remediation contracts and, further, it cannot prove that any alleged reliance caused Raygarr's

damages.  (Doc. 83 at 10-11.)

To establish a promissory estoppel claim, a plaintiff must prove: that the defendant "made a promise," that the defendant "should have reasonably foreseen" that the plaintiff would rely on the promise, and that the plaintiff "actually relied on the promise to [its] detriment."  *Higginbottom v. Arizona*, 51 P.3d 972, 977 (Ariz. App. 2002); *see also Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.*, 736 P.2d 13, 16 (Ariz App. 1987).  Defendant argues that, even assuming Mireles told Garrison that EMC would cover remediation costs, Plaintiff cannot prove that Raygarr actually relied on any promise or statement of EMC to its detriment.  (Doc. 83 at 12.)

To establish an insurance bad faith claim, a plaintiff must prove that an "insurer intentionally denie[d], fail[]ed to process or pay a claim without a reasonable basis." *Zilisch v. State Farm Mut. Auto Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000); *see also Rawlings v. Apodaca*, 726 P.2d 565, 571 (Ariz. 1986) (conduct by an insurer which wrongfully deprives the insured "of the very security for which he bargained or expose[s] him to the catastrophe from which he sought protection" breaches the implied covenant of good faith and fair dealing implied in the insurance contract).  Defendant argues that Plaintiff cannot prove that any breach of the duty of good faith and fair dealing by Defendant was the cause of Plaintiff's damages.  (Doc. 83 at 12-13.)

Defendant's arguments regarding Plaintiff's negligent misrepresentation, promissory estoppel, and insurance bad faith claims all hinge on whether undisputed evidence establishes that Raygarr would have entered into remediation contracts and incurred remediation costs regardless of any representations by EMC.  According to Defendant, Raygarr voluntarily incurred remediation expenses because Raytheon instructed it to remediate the flood damage and Raygarr risked losing Raytheon as a client if it declined.  (Doc. 83 at 11.)  Defendant alleges that Garrison had the sole authority to determine whether Raygarr would incur flood remediation expenses, and that Garrison testified at his deposition that he could only speculate as to whether he would have executed remediation contracts with Abracadabra and ATI had EMC informed him

that the Policy only covered damages for which Raygarr was legally liable. (*Id.* at 2, 11.)
In its Response, Plaintiff argues that Defendant's Motion mischaracterizes Garrison's
deposition testimony. (Doc. 91 at 2-8.)

The following exchange occurred during Garrison's deposition:

> Q.     If [Mireles] had said on that first call on the 10th—if [Mireles] had
> told you, "This is a liability coverage policy. EMC will pay for whatever
> Raygarr is legally liable," if that had been his statement, would you still
> have participated in the remediation?
> A.     I don't think so. But that's a hypothetical. And I'm sure it would
> have caused us pause and would have taken a lot of discussion.
>         But I'm a small company. If I didn't know all the damages were
> within an umbrella, that [sic] I don't have the resources to do that. I was
> running a very tight ship to have advance [sic] our plan.
>         And even with the plan in place, no general contractor can take that
> hit. And that's why they carry insurance coverage.
> Q.     So let me see if I understand you correctly.
>         If you had been informed that your liability policy has coverage, but
> only for what Raygarr is legally liable for, you said it would have caused
> you pause.
>         But can you say with any definity [sic], one way or the other,
> whether you would have still participated in the remediation project?
> A.     I've thought about that a lot, and it's hard to answer when you're not
> actually in the middle of the event.
>         Because, of course, now I'm jaded and saying what the hell was I
> thinking.
> Q.     It's hard to answer questions like that in retrospect?
> A.     Yeah. Yes.
> Q.     So, for now, would it be fair to say that your answer is that you don't
> know, you can't say, you don't know what you would have done if that is
> the information that would have been conveyed to you?
> A.     It would be a guess.
> Q.     It would be speculation?
> A.     Speculation.

(Doc. 84-1 at 62-63.) Garrison also indicated that if he had learned, after signing
remediation contracts, that EMC was not going to cover Raygarr for expenses incurred
under those contracts, he is not sure what he would have done because he is not sure
Raygarr "had the ability to walk off the project" at that point in time. (*Id.* at 66-67.)

In an affidavit attached to Plaintiff's Controverting Statement of Facts, Garrison
avers that answering the hypothetical asked of him during his deposition required
speculation because he doesn't know what Raytheon or Qualified or their respective
insurance carriers would have done if he had told them that EMC was not authorizing
him to enter remediation contracts. (Doc. 92-1 at 4.) Garrison knew that "Raygarr did

not have the resources to pay those costs without insurance," but "Raytheon might have agreed to sign the remediation contracts and later pursue a claim with its insurance carrier or against EMC or Qualified Mechanical's insurance." (*Id.*)  Furthermore, Raytheon "might have decided to hire another contractor to perform the remediation and repair work." (*Id.* at 5.)  Garrison avers that, had Mireles told him that EMC did not authorize him to enter remediation contracts and would not cover remediation costs, he "would have undertaken whatever steps were necessary to coordinate with Raytheon, Qualified and/or their insurance carriers to get someone else to agree to enter the remediation contracts" and "would not have voluntarily assumed contractual liability for remediation costs without assurance/agreement that those costs would be paid by either Raytheon, Qualified Mechanical or one of their insurance carriers." (*Id.* at 5-6.)

Defendant argues that the Court should disregard Garrison's affidavit as a sham. (Doc. 99 at 5-7.)  An affidavit submitted to defeat summary judgment should be disregarded as a sham if it contradicts a party's prior deposition testimony. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).  However, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998-99.  A "non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony." *Id.* at 999.

Defendant argues that Garrison's affidavit "directly contradicts his" deposition testimony because Garrison testified in the deposition that it is "speculative" whether he would have declined to execute remediation contracts if he had been told EMC would cover only losses for which Raygarr was legally liable, whereas in the affidavit he averred that he would not have signed the contracts in that scenario.  (Doc. 99 at 6-7.)  Defendant does not dispute that Garrison's "speculation" testimony related to whether Raygarr would have "participated in the remediation project" rather than whether Raygarr would have signed remediation contracts with Abracadabra and ATI; however, Defendant argues that the phrase "participated in the remediation project" unambiguously means participated in the remediation project as a general contractor, including signing

contracts with subcontractors such as Abracadabra and ATI. (*Id.* at 2-5.)

The Court declines to disregard Garrison's affidavit as a sham; the affidavit does not contradict Garrison's deposition testimony but, rather, sets forth a reasonable explanation of the basis for and thought process behind that testimony. The Court disagrees with Defendant that the phrase "participated in the remediation project" unambiguously means "signed remediation contracts with Abracadabra and ATI." Raygarr could have participated in the remediation project in a number of ways, and could have participated even as a general contractor without signing the remediation contracts (for example, if Raytheon had agreed to sign the contracts with Abracadabra and ATI but had Raygarr supervise and coordinate the remediation work). In addition, the Court notes that Garrison initially testified that he did not think Raygarr would have participated in the remediation if Mireles had told him that EMC would pay for only those costs for which Raygarr was legally liable. (Doc. 84-1 at 62.) Furthermore—for the reasons discussed below—a representation that EMC would cover only losses for which Raygarr was legally liable does not unambiguously mean that EMC would not cover any remediation expenses. The hypothetical asked during Garrison's deposition testimony differs in material respects from the conclusion that Defendant asks the Court to draw from that testimony.

A reasonable trier of fact could conclude—based on Garrison's deposition testimony and affidavit, as well as other evidence in the record—that Raygarr would not have signed remediation contracts with Abracadabra and ATI if Mireles had not told Raygarr that EMC would cover the remediation expenses. Accordingly, Defendant's Motion for Summary Judgment will be denied with respect to Plaintiff's negligent misrepresentation, promissory estoppel, and insurance bad faith claims.

## B. Breach of Contract

Defendant argues that the Policy and Umbrella Policy cover only those damages for which Raygarr is legally liable, and that EMC already paid all damages for which Raygarr was legally liable by defending and settling the lawsuit filed by Raytheon against

Raygarr and obtaining a release on Raygarr's behalf. (Doc. 83 at 13-15.) Defendant further argues that it had no obligation under the Policy or Umbrella Policy to cover the contractual obligations assumed by Raygarr to pay ATI and Abracadabra for remediation services. (*Id.*) In its Response, Plaintiff argues that Defendant breached Section IV(2)(d) of the Policy, which provides: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." (Doc 91 at 10-11.) In its Reply, Defendant counters that Section IV(2)(d) is an exclusionary condition and "[t]he non-application of an exclusionary condition does not create coverage under the Policy where there is no coverage or where all coverage has been provided." (Doc. 99 at 2, 9.)

The Court agrees with Defendant that Section IV(2)(d) is an exclusionary condition that does not create coverage where none exists. However, the language of Section IV(2)(d) would be entirely superfluous if remediation expenses or obligations were never covered by the other terms of the Policy and Umbrella Policy. Defendant does not dispute that the Policy and Umbrella Policy covered sums that Raygarr was legally obligated to pay because of property damage caused by the flooding of Building 842; indeed, EMC defended Raygarr against and settled Raytheon's claims in the prior litigation arising from that flood. (DSOF ¶¶ 6-7; PCSOF ¶¶ 6-7.) Defendant argues that, by defending against and settling Raytheon's claims against Raygarr, EMC provided all coverage available under the Policy. However, Defendant has offered no evidence contradicting Plaintiff's evidence that, if not for the flood remediation work performed by Raygarr, Abracadabra, and ATI, damages from the flood—including business-interruption damages—would have been much higher. (*See* Doc. 84-1 at 62 (Garrison testifying that timely remediation saved "millions of dollars" in damages); Doc. 86-1 at 41 (Raygarr Project Manager Greg Garrison testifying that total damages from the flood would have increased exponentially if there had been delays in the remediation efforts); Doc. 92-1 at 5 (Garrison affidavit averring that timely remediation was critical in saving millions of dollars in flood damages); *see also* Section V(C), *infra*.) Accordingly,

undisputed evidence shows that, by entering into remediation contracts with Abracadabra and ATI and by deploying its own staff and resources in the flood remediation efforts, Raygarr reduced the damages sought by Raytheon in the prior litigation.  Again, Defendant does not dispute that the Policy obligated it to defend Raygarr against Raytheon's claims in that prior litigation and to pay for any amounts for which Raygarr was determined legally liable.  The Policy covers property damage "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement" so long as the insured would have had liability for the damages "in the absence of the contract or agreement." (Doc. 84-1 at 36.)  The record supports a finding that EMC breached this contractual provision by failing to pay remediation costs, because the expenses incurred by Raygarr in the remediation contracts with Abracadabra and ATI reduced the flood damages ultimately sought by Raytheon in its prior litigation against Raygarr.

Certainly, Section IV(2)(d) would bar coverage of remediation expenses and obligations incurred by Raygarr if Raygarr incurred the expenses or assumed the obligations without obtaining the prior consent of EMC.  However, as discussed above, the Court assumes for purposes of Defendant's Motion for Summary Judgment that EMC authorized Raygarr to incur the remediation expenses.  Accordingly, there is no basis for granting summary judgment in Defendant's favor on Plaintiff's breach of contract claim.

### C.    Punitive Damages

Defendant argues that Plaintiff cannot satisfy Arizona's punitive damages standard because there is no evidence that Defendant acted with intent to injure Plaintiff or that Defendant consciously pursued a course of conduct knowing it created a substantial risk of significant harm.  (Doc. 83 at 15-16 (citing *Rawlings v. Apodaca*, 726 P.2d 565 (Ariz. 1986) and *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675 (Ariz. 1986).)  Defendant further argues that Plaintiff cannot establish that any act of EMC or Mireles caused Plaintiff's damages.  (*Id.* at 16.)  Plaintiff's Response incorporates by reference its Motion to Establish Prima Facie Case of Punitive Damages, and argues that sufficient

evidence shows that EMC acted intentionally, dealt unfairly and/or dishonestly with Raygarr, "failed to give fair and equal consideration to Raygarr's interests," and "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm" to Raygarr. (Doc. 91 at 11-12.)  Defendant's Reply incorporates by reference its Response to Plaintiff's Motion to Establish Prima Facie Case of Punitive Damages, and argues that, even assuming as true Plaintiff's version of the representations made by Mireles, "there remains no evidence of conduct by Mr. Mireles or EMC that could support an award of punitive damages." (Doc. 99 at 10.)  As discussed below, the Court will consider the parties' briefs relating to Plaintiff's Motion to Establish Prima Facie Case of Punitive Damages in conjunction with the parties' briefs relating to Defendant's Motion for Summary Judgment as to Plaintiff's punitive damages claim.

"[P]unitive damages are those damages awarded in excess of full compensation to the victim in order to punish the wrongdoer and to deter others from emulating his conduct." *Linthicum*, 723 P.2d at 679.  "To obtain punitive damages, [a] plaintiff must prove that [the] defendant's evil hand was guided by an evil mind" by showing either that the defendant "intended to injure the plaintiff" or "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 726 P.2d at 578.  "The wrongdoer must be consciously aware of the wrongfulness or harmfulness of his conduct and yet continue to act in the same manner in deliberate contravention to the rights of the victim." *Linthicum*, 723 P.2d at 79.

The Court rejects Defendant's causation argument for the reasons discussed above and further finds that there is sufficient evidence in the record from which a reasonable trier of fact could properly award punitive damages.  A reasonable juror who concluded that Mireles authorized Raygarr to enter into remediation contracts could further conclude that EMC later refused to honor that authorization, either despite knowledge that Mireles had provided the authorization or despite insufficiently investigating the representations made by Mireles.  The record contains deposition testimony from which a reasonable inference could be drawn that EMC representatives failed to ask Mireles

whether he authorized Raygarr to enter into remediation contracts at a time when he likely would have had independent recollection of his conversations with Garrison. (*See* Doc. 86-2 at 3-4 (testimony by Mireles that he does not recall discussing with his supervisor or EMC's coverage counsel the allegation that he authorized Raygarr to enter into remediation contracts.)  Furthermore, although Misheck's September 23, 2014 letter to Raygarr states that Mireles did not provide authorization for Raygarr to enter into remediation contracts, a reasonable juror could find that Misheck reached that conclusion based on erroneous information regarding the date on which the contracts had been entered. (*See* Doc. 84-1 at 30-31; Doc. 86-2 at 19-20; Doc. 88-2 at 27-28; Doc. 94 at 65-66.)  In addition, EMC's claim file notes indicate that EMC considered paying for remediation costs and then seeking reimbursement from Qualified or Raytheon, which supports a reasonable inference that EMC knew it had an obligation, based on Mireles's representations to Raygarr, to advance-pay remediation costs pending a conclusive liability determination. (*See, e.g.*, Doc 86-2 at 17 and Doc. 88-2 at 41 (October 29, 2014 claim file note by Misheck indicating Qualified's and Raytheon's insurers would not advance pay and stating: "it looks as if we need to adjust these charges and . . . move forward with our investigation into the facts, and seek reimbursement against either Qualified or Raytheon").

The record also contains evidence indicating that EMC was aware that damages related to the flood would increase significantly absent prompt remediation.  A September 16, 2014 claim file note by Mireles states that Raytheon's Building 842 contained "180+ rooms with top secret experimental and production components," as well as a "multi-million dollar chamber which was under 18" of water," and that an estimated "$250,000-300,000 in lost production per day" as well as "huge contracts" were at stake. (Doc. 88-2 at 16.)  Similarly, a September 18, 2014 claim file note by Misheck states: "The biggest exposure will come with business interruption and or production delays," which were estimated to be in the "$250,000 range per day," resulting in expected business interruption costs "in the multi-millions." (*Id.* at 20.)

Garrison also informed EMC that Raygarr's prompt remediation response prevented "extreme damage that would have occurred with a slow response to the disaster." (*Id.* at 43.) As EMC was contractually obligated to defend Raygarr against damage claims related to the flood, and to pay for any damages for which Raygarr was found legally liable, a juror could reasonably conclude that reducing overall flood damages through prompt remediation was in EMC's financial interests.

Finally, the record contains evidence indicating that EMC was on notice of the harm that its failure to promptly pay remediation costs would cause Raygarr. For example, claim file notes reflect that EMC was aware that Raygarr was incurring obligations it could not afford and was looking to EMC to cover its remediation costs. (*See, e.g.*, Doc. 88-2 at 18 (September 17, 2014 claim file note by Mireles stating "insured started to incur obligations they cannot afford"); *id.* at 20 (September 18, 2014 claim file note by Mireles stating Raygarr was looking to EMC to cover remediation costs.) Mischek testified that, in the September 2014 time frame, he understood that Raytheon was basically Raygarr's only client, and that maintaining a good relationship with Raytheon was critical for Raygarr. (Doc. 88-3 at 24.) In addition, November 2014 emails between Garrison and Misheck reflect that Garrison told Misheck that "since EMC's representing that they would not honor their insurance responsibilities" to Raygarr, Raygarr was "removed from work at Raytheon and removed from a $440,000 project" it had just begun. (Doc. 88-2 at 43.) Garrison also advised Misheck that Raygarr was "now very fearful" that it "face[d] the risk of being removed from Raytheon . . . a final time" and that it faced a risk of being permanently removed from Raytheon, as well as "the possibility of it's [sic] demise and the loss of livelihood to" Garrison and his family members and employees, in addition to harm to unpaid subcontractors. (*Id.*)

Based on the above, a reasonable juror could conclude: (1) that Mireles authorized Raygarr to enter into remediation contracts and to incur remediation costs because prompt remediation was in EMC's financial interests; (2) that EMC knew or reasonably should have known of Mireles's authorization; (3) that EMC knew Raygarr's prompt

remediation efforts significantly decreased the overall flood damages that EMC was contractually bound to defend Raygarr against and, if Raygarr was found legally liable, pay; (4) that EMC knew its failure to pay remediation costs would cause Raygarr extreme, possibly terminal hardship; and (5) that, despite its advance authorization and the benefit it received from Raygarr's remediation efforts, and knowing the harm that its actions would cause Raygarr, EMC refused to pay remediation costs, resulting in the demise of Raygarr's business. Accordingly, a reasonable juror could find that EMC "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others," thus entitling Raygarr to punitive damages. *Rawlings*, 726 P.2d at 578.

## VI. Plaintiff's Motion to Establish Prima Facie Case of Punitive Damages

In this Motion, Plaintiff seeks "a court order permitting Plaintiff to mention and discuss bad faith and punitive damages in its Opening Statement and during its case-in-chief." (Doc. 87 at 1.) While preserving all trial objections, Defendant does not dispute that Plaintiff will be entitled to discuss the evidence that it will present in support of its insurance bad faith claim in its opening statement and in its case-in-chief at trial if the claim survives Defendant's Motion for Summary Judgment. (Doc. 95 at 2.) Defendant opposes Plaintiff's Motion with respect to Plaintiff's request for punitive damages, arguing that the punitive damages claim should be dismissed for the reasons raised in Defendant's Motion for Summary Judgment. (*Id.*)

Plaintiff appears to have envisioned its Motion to Establish Prima Facie Case of Punitive Damages as a summary judgment motion under Rule 56 of the Federal Rules of Civil Procedure, as Plaintiff accompanies the Motion (Doc. 87) with a separate Statement of Facts (Doc. 88). The Court's Scheduling Order provides: "Absent leave of Court, each party shall file no more than one motion for summary judgment under Fed. R. Civ. P. 56." (Doc. 17 at 4.) If Plaintiff's Motion to Establish Prima Facie Case of Punitive Damages is construed as a summary judgment motion, then Plaintiff violated this provision of the Scheduling Order by filing two summary judgment motions without

leave of Court. However, the Motion to Establish Prima Facie Case of Punitive Damages cannot properly be characterized as a summary judgment motion, because, in essence, it requests that summary judgment *not* be granted in Defendant's favor on Plaintiff's claims for insurance bad faith and punitive damages. Accordingly, the Motion is more fairly characterized as supplemental briefing—again, filed without leave of Court—related to Defendant's Motion for Summary Judgment seeking dismissal of Plaintiff's insurance bad faith and punitive damages claims. Despite the idiosyncratic nature of the parties' filings related to this Motion, the Court has reviewed the filings in the context of evaluating Defendant's Motion for Summary Judgment seeking dismissal of Plaintiff's insurance bad faith and punitive damages claims.[7]

As discussed above, the Court is denying Defendant's Motion for Summary Judgment in its entirety, including Defendant's request to dismiss Plaintiff's claims for insurance bad faith and punitive damages. Based on that ruling, Plaintiff is entitled, subject to the limitations of any applicable rules of civil procedure and any subsequent evidentiary limitations imposed by the Court, to discuss evidence supporting its claims for insurance bad faith and punitive damages during its opening statement, and to present that evidence during its case-in-chief. Accordingly, the Court will grant Plaintiff's Motion to Establish Prima Facie Case of Punitive Damages to the extent that, based on the Court's ruling on Defendant's Motion for Summary Judgment, Plaintiff's claims for insurance bad faith and punitive damages remain pending in this case.

. . . .

. . . .

. . . .

---

[7] Defendant responded to Plaintiff's Motion to Establish Prima Facie Case of Punitive Damages (Doc. 95), but Defendant neither filed a controverting Statement of Facts nor moved to strike the Statement of Facts filed by Plaintiff. The nature of the parties' filings make it difficult for the Court to discern whether the "facts" contained in Plaintiff's Statement of Facts in Support of Motion to Establish Prima Facie Case of Punitive Damages (Doc. 88) are disputed or not. Accordingly, the Court has focused its summary judgment analysis on the evidence submitted by the parties rather than on the facts set forth in Plaintiff's Statement of Facts in Support of Motion to Establish Prima Facie Case of Punitive Damages.

**IT IS ORDERED** that Plaintiff's Motion to Postpone Summary Judgment Proceedings and to Reopen Discovery (Doc. 106) is **partially granted and partially denied**. Plaintiff's request to postpone the summary judgment proceedings is **denied**, but Plaintiff's request to reopen discovery for the limited purpose of allowing the parties to depose David Conger is **granted**.

**IT IS FURTHER ORDERED** that discovery is reopened for a period of **sixty (60) days** for the sole purpose of allowing the parties to depose David Conger.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment Regarding Causation, Breach of Contract and Punitive Damages (Doc. 83) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 85) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Establish Prima Facie Case of Punitive Damages (Doc. 87) is **granted** to the extent that, based on the Court's denial of Defendant's Motion for Summary Judgment, Plaintiff's insurance bad faith and punitive damages claims remain pending in this case.

**IT IS FURTHER ORDERED** that the parties shall file a Joint Proposed Pretrial Order within **forty-five (45) days** of the date that the deposition of David Conger is completed.

Dated this 25th day of February, 2020.


Honorable Rosemary Márquez
United States District Judge