LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE, SUITE 1600
PHOENIX, ARIZONA  85004
(602) 271-7700

Alicyn M. Freeman (023916)
amf@bowwlaw.com
Robert T. Sullivan (022719)
rts@bowwlaw.com
Minute Entries/Orders
cjg@bowwlaw.com

*Attorneys for Defendant Employers Mutual
Casualty Company dba EMC Insurance Companies*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Raygarr, LLC, an Arizona limited liability company,<br><br>              Plaintiff,<br><br>v.<br><br>Employers Mutual Casualty Company dba EMC Insurance Companies, a foreign corporation,<br><br>              Defendant. | Case No. 4:18-cv-00246-RM<br><br>**DEFENDANT EMC'S DAUBERT MOTION TO PRECLUDE OPINIONS AND EXPERT TESTIMONY OF JOHN PATTON**<br><br>(Oral Argument Requested)<br><br>(Honorable Rosemary Márquez) |

Defendant Employers Mutual Casualty Company, d/b/a EMC Insurance Companies ("EMC"), by and through undersigned counsel, hereby submits this Motion to Preclude the Opinions and Expert Testimony of Plaintiff's expert witness John Patton. Mr. Patton's standard of care opinions are based on a heightened, and therefore inapplicable, standard of care. Because these opinions are incapable of helping the jury understand the evidence or

determine a fact in issue, their testimony must be precluded pursuant to Rule 702, FRE. Defendant requests an evidentiary hearing on this Motion.

## I.      FACTUAL BACKGROUND.

EMC issued a Commercial General Liability (the "Policy") and an Umbrella Policy (the "Umbrella Policy") to Plaintiff.  Under the Policy, EMC provided Plaintiff insurance coverage, pursuant to the terms, conditions, limitations and exclusions of the Policy, for "sums that the insured becomes legally obligated to pay as damages" because of property damage to which the insurance applies. The Policy precludes coverage for voluntarily assumed obligations.

On the morning of September 9, 2014, Raygarr received notice of a flood at a property owned by Raytheon.  At the time of the flood, Raygarr was under contract with Raytheon to upgrade bathrooms at the affected property.  Before speaking with its insurance carrier, Raygarr took responsibility for the loss, began remediation of the Raytheon property, and signed at least one contract with a remediation company.  Plaintiff claims that after the flood incident, it called EMC to discuss coverage to begin the remediation process, and Fabian Mireles instructed Plaintiff to enter remediation contracts because EMC would pay for whatever Plaintiff voluntarily incurred.  EMC performed an investigation to determine who was legally liable for the flood, and eventually informed Plaintiff that it did not determine Raygarr to be legally liable for the flood.

Plaintiff has disclosed Mr. Patton to opine that the interactions between Plaintiff and Mr. Mireles fell below the standard of care for an insurance adjuster.  More specifically, Mr. Patton has been disclosed to testify "that EMC failed to act with reasonable care or competence in obtaining or communicating information to its insured, Raygarr, when it represented that Raygarr had a covered loss and consented to Raygarr entering into contracts with remediation subcontractors and with its continued handling of the claim."  *See* Plaintiff's 5th Supplemental Disclosure Statement, attached as **Exhibit A**.

During his deposition, Mr. Patton testified that his opinions are based on "best practices" or the "golden standard" – neither of which are the proper standard:

> Q: So do you understand that there's a difference between best practices and the standard of care?
>
> …
>
> **A: Yes.**
>
> Q: Okay. So you can as an insurance company or adjuster act reasonably within the standard of care without following the best practices. Do you agree with that?
>
> **A: I'm not sure I do.**
>
> Q: Okay. Is it your opinion that the standard of care is the best practices?
>
> **A: No. Because, first of all, I guess, maybe I've been away from the active business for a long time, because I've never heard standard of care associated with insurance company.**
>
> …
>
> Q: Is it your opinion that the – in order to act reasonably, an insurance carrier has to follow the best practice?
>
> **A: Yes.**
>
> Q: Okay. The gold standard, right?
>
> **A: Yes.**
>
> …
>
> Q: So if an insurance carrier does not follow that gold standard, best practices in your opinion, they have fallen below – they've not acted reasonably?
>
> **A: Correct.**
>
> …

3

Q: And so when we talked today about what in your opinion Mr. Mireles was required to do, those were all those best practices and gold standard-type practices?

**A: Yes.**

*See* Deposition of John Patton, 157:3-158:8; 159:10-15, attached as **Exhibit B**.

## II.    MR. PATTON'S TESTIMONY MUST BE PRECLUDED PURSUANT TO RULE 702.

Rule 702 of the Federal Rules of Evidence provides that an expert may only testify if his knowledge will help the jury understand the evidence or determine a fact in issue:

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case."

The party seeking to admit expert testimony must prove, by a preponderance of the evidence, that the testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). "[T]he Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Id.* "The objective of [*Daubert's* gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is

to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591; (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02], p.702-18 (1988)).   A trial judge must determine, at the outset, whether the expert's testimony "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.   The question of whether testimony will help a jury "goes primarily to relevance." *Id.* at 591.   "The only true criterion is:  on this subject can a jury receive from this person appreciable help?  In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to that subject." *Englehart v. Jeep Corp.*, 122 Ariz. 256, 258-59, 594 P.2d 510, 512-13 (1979) (citing VII Wigmore, Evidence § 1923).  Mr. Patton's testimony must be precluded under this standard.

The opinions of Mr. Patton, Plaintiff's standard of care expert, are based on an improper standard of care.  An expert must base his opinion on "specialized *knowledge* and not on belief or speculation, and inference must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (emphasis in original).  <u>For expert testimony to help a jury, it must be relevant, meaning that it must be directed at what the plaintiff must prove</u>.  *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010).  Here, for Raygarr to succeed on its claim, it must prove that EMC breached the standard of care in its handing of Raygarr's claim.  The standard of care for an insurer in dealing with its insured involves judging their conduct against "the skill and knowledge normally possessed by members of that trade or profession in good standing in similar communities." *Powder Horn Nursery, Inc. v. Soil & Plant Lab., Inc.*, 119 Ariz. 78, 82, 579

P.2d 582, 586 (Ct. App. 1978) (quoting *Kreisman v. Thomas*, 12 Ariz. App. 215, 220, 469 P.2d 107, 112 (1970)); *see also* Restatement (Second) of Torts § 299A (1965).

A standard of care expert must know what the governing standard is for his testimony to be helpful to the jury. *Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 817 (9th Cir. 2014). In *Pyramid Technologies*, an expert testified that the opposing standard of care expert applied the wrong standard. *Id.* However, he could not annunciate the appropriate standard to apply instead. *Id.* The Ninth Circuit found his testimony to be inadequate and precluded it. *Id.* Like in *Pyramid Technologies*, Mr. Patton is unable to describe the appropriate standard against which EMC's actions should be measured, but instead described only "best practices" or the "gold standard" during his deposition. *See* **Exhibit B** at 157:3-158:8; 159:10-15.

Mr. Patton's testimony that the "gold standard" is the standard of care an insurance carrier has to follow to comply with in handing a claim is an incorrect application of Arizona law. Maybe more telling than his application of the improper standard of care is Mr. Patton's own testimony that he had never heard of or applied the "standard of care" to an insurance company – which is precisely what he was disclosed to do in this case. The clearly defined standard of care in Arizona is **"the skill and knowledge normally possessed by members of that trade or profession in good standing in similar communities."** *Powder Horn Nursery, Inc. v. Soil & Plant Lab., Inc.*, 119 Ariz. at 82, 579 P.2d at 586 (emphasis added). Mr. Patton's version of the standard of care is therefore incorrect, irrelevant, and will not help the jury apply the facts at hand to the law. *See also American Strategic Insurance Corp. v. Scope Services, Inc.*, 2017 WL 4098722 at *6 (D. Md. Sept. 15, 2017 (holding that an expert who testified to "little more than his personal views" about the standard of care, and who "set[] forth an 'exceptionally high' standard of care without foundation 'in government regulation, industry standard, or common practice,'" should be precluded from testifying) (quoting *Montgomery v. CSX Transportation, Inc.*, 230 F. Supp. 3d 447, 454 (D. Md. 2017)).

Mr. Patton's testimony is not only unhelpful to the jury, it is confusing and misleading because it relies on a standard of care that is inaccurate and not recognized by Arizona law. If Mr. Patton's testimony is allowed, the jury could apply his incorrect "gold standard" standard of care in deciding that EMC acted in bad faith, which would unquestionably prejudice EMC and "ring the bell that cannot be unrung." *See IceMOS Tech. Corp. v. Omron Corp.*, CV-17-02572-PHX-JAT, 2020 WL 2083817 (D. Ariz. Mar. 6, 2020). For these reasons, Mr. Patton's testimony must be precluded at trial.

## III.   CONCLUSION.

The opinions of Mr. Patton, in which he relies on the improper "gold standard" of care, are wholly unhelpful to the jury, misleading, and will unduly prejudice EMC.  In fact, his opinions will be not only unhelpful, but actually harmful to the jury's understanding of the case because the "gold standard" is not the standard the jury will apply in determining whether or not EMC acted in bad faith. Mr. Patton's opinions and testimony must be precluded under Rules 702 and 403, FRE.

DATED this 8th day of September, 2020.

BROENING OBERG WOODS & WILSON, P.C.


By:  */s/ Alicyn M. Freeman*
      Alicyn M. Freeman
      Robert T. Sullivan
      2800 North Central Avenue, Suite 1600
      Phoenix, Arizona 85004
      *Attorneys for Defendant Employers Mutual Casualty Company dba EMC Insurance Companies*

7

## CERTIFICATE OF SERVICE

I certify that on September 8, 2020, I electronically submitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

> Melvin C. Cohen
> Patrick J. Lopez
> MESCH CLARK ROTHSCHILD
> 259 North Meyer Avenue
> Tucson, Arizona 85701
> mcohen@mcrazlaw.com
> plopez@mcrazlaw.com
> *Attorneys for Plaintiff*

By: */s/ Suzanne Beard*

# EXHIBIT A

MESCH CLARK ROTHSCHILD
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax:    (520) 798-1037
Email: mcohen@mcrazlaw.com
Email: plopez@mcrazlaw.com

By:    Melvin C. Cohen, #003728
        Patrick J. Lopez, #019183
        78007-8/blc
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| RAYGARR, LLC, an Arizona limited liability company, | Case No.  4:18-cv-00246-RM |
| Plaintiff, | **PLAINTIFF'S 5th SUPPLEMENTAL DISCLOSURE STATEMENT** |
| v. | |
| EMPLOYERS MUTUAL CASUALTY COMPANY DBA EMC INSURANCE COMPANIES, a foreign corporation, | Assigned to Hon. Rosemary Márquez |
| Defendant. | |

Plaintiff Raygarr, LLC, by and through undersigned counsel, hereby supplements its previous Supplemental and Amended Responses to the Court's Mandatory Initial Discovery Requests with the following additional information reflected in **bold type**.

1.      State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's

1 claims or defenses, and provide a fair description of the nature of the information each such
2 person is believed to possess.

3 **RESPONSE:**

4 A.    Raymond Garrison
          Raygarr, LLC
5          c/o Mesch Clark Rothschild
6          259 N. Meyer Avenue
          Tucson, AZ 85701
7          (520) 624-8886

8      Ray Garrison is the principal for Raygarr, LLC.  Mr. Garrison is expected to testify
9 generally about his communications with Raygarr's insurance carrier, EMC, its agents and
10 representatives, regarding an incident that occurred on or about September 9, 2014, at
11 Raytheon, during a construction project more specifically located and identified as Building
12 842 Restroom Upgrade (the "Project").  Raytheon hired Raygarr to be the general contractor
13 for the Project. Ray Garrison will testify that on or about the morning of September 9, 2014,
14 Raytheon informed Raygarr representatives that a flood occurred at Building 842, allegedly
15 caused by the breaking of a number of temporary PVC caps installed by Raygarr's plumbing
16 subcontractor Qualified Mechanical Contractors ("QMC"), resulting in water flooding
17 within Building 842 causing extensive property damage to the building and the personal
18 property inside it.

19      Ray Garrison will further testify that on or about September 9, 2014, Raytheon
20 represented to Raygarr that Raygarr was, as general contractor, responsible for the flood
21 incident in Building 842 and demanded Raygarr be responsible for the flood remediation
22 and repairs, including assessing damages, scheduling and coordinating all work, and hiring
23 all subcontractors.

24      Mr. Garrison will testify about his knowledge of the events that took place on or
25 about September 9, 2014, his communications with EMC, and giving notice to EMC of a
26 potential claim under Raygarr's CGL Policy #5D0-74-23---15 and/or Raygarr's Umbrella

1     Policy #5J0-74-23---15. Mr. Garrison will further testify about his conversations with EMC
2     representatives, including EMC claims adjuster Fabian Mireles, in which Mireles confirmed
3     coverage and authorized Raygarr to proceed with repair and remediation and that the
4     insurance would pay for those costs.

5         Mr. Garrison will testify about his conversations with Defendant's representatives,
6     his decision to enter contracts with the flood remediation subcontractors and suppliers based
7     upon his conversations with Defendant's agents and representatives, the costs incurred for
8     the remediation and repair work performed by Raygarr and its subcontractors and suppliers
9     following the Flood Event, and EMC's failure to pay Raygarr or its subcontractors and
10     suppliers for the costs incurred, despite assurances by EMC that Raygarr had coverage and
11     payment would be made.

12         Mr. Garrison will testify regarding the damages incurred by Raygarr as a result of
13     EMC's breach of contract and negligent misrepresentation, including Raygarr being forced
14     out of business. **Ray Garrison has reviewed and will testify based upon the information**
15     **provided in Raytheon's Response to Raygarr's 30(b)(6) Deposition by Written**
16     **Questions, which identified all construction projects performed by Raytheon at either**
17     **of its Tucson facilities between January 1 2015 through June 4 2019 "with a contract**
18     **amount of $1million or less".  Based upon the information provided by Raytheon, Ray**
19     **Garrison will testify as to the extent that Raygarr could have bid on and performed the**
20     **work identified by Raytheon in its Response. Mr. Garrison will testify that Raygarr**
21     **was one of a very limited number of approved contractors allowed to bid at Raytheon**
22     **and had the capacity and ability to bid on and perform as much work as was available**
23     **at Raytheon and that Raygarr was the successful bidder on approximately 90% of the**
24     **Projects bid by Raygarr during 2013 and 2014.**

25

26

1

B.     Greg Garrison
       Raygarr LLC
2      c/o Mesch Clark Rothschild
       259 N. Meyer Avenue
3      Tucson, AZ 85701
       (520) 624-8886
4

5      Greg Garrison was the Project Manager/Estimator for Raygarr on the Raytheon

6 Project for Building 842 Restroom Upgrade. Greg Garrison will testify generally about his

7 communications with Raygarr's insurance carrier, EMC, its agents and representatives,

8 regarding the incident described in 1A above. Greg Garrison will testify about his

9 understanding of conversations held with Defendant's representatives, Raygarr's decision to

10 enter contracts with the flood remediation subcontractors and suppliers based upon his

11 conversations with Defendant's agents and representatives, the costs incurred for the

12 remediation and repair work performed by Raygarr and its subcontractors and suppliers

13 following the Flood Event, and EMC's failure to pay Raygarr or its subcontractors and

14 suppliers for the costs incurred, despite assurances by EMC that Raygarr had coverage and

15 payment would be made.

16      Greg Garrison will testify regarding the damages incurred by Raygarr as a result of

17 EMC's breach of contract and negligent misrepresentation, including Raygarr LLC being

18 forced out of business. **Greg Garrison has reviewed and will testify based upon the**

19 **information provided in Raytheon's Response to Raygarr's 30(b)(6) Deposition by**

20 **Written Questions, which identified all construction projects performed by Raytheon**

21 **at either of its Tucson facilities between January 1 2015 through June 4 2019 "with a**

22 **contract amount of $1million or less". Based upon the information provided by**

23 **Raytheon, Greg Garrison will testify as to the extent that Raygarr could have bid on**

24 **and performed the work identified by Raytheon in its Response. Mr. Garrison will**

25 **testify that Raygarr was one of a very limited number of approved contractors allowed**

26 **to bid at Raytheon and had the capacity and ability to bid on and perform as much**

**work as was available at Raytheon and that Raygarr was the successful bidder on approximately 90% of the Projects bid by Raygarr during 2013 and 2014.**

  C. Fabian Mireles – Senior Claims Adjuster
    EMC
    c/o Broening Oberg Woods & Wilson
    2800 N Central Ave Ste 1600
    Phoenix, AZ 85004
    (602) 271-7767

  Fabian Mireles is the Senior Claims Adjuster for EMC and the representative who spoke with Ray Garrison and/or Greg Garrison related to the flood incident at Raytheon Building 842 on or about September 9, 2014. Mr. Mireles is expected to testify about his conversations with Raygarr about the claim and his understanding of the coverage issues related to this claim. **Mr. Mireles is also expected to testify consistent with his deposition testimony taken December 13, 2018**.

  D. Dave Conger – Claims Adjuster
    Western States

  Dave Conger was an independent field adjuster contracted by EMC to review the claim made by Raygarr. Mr. Conger is expected to testify regarding his conversations with Ray Garrison on or about September 11, 2014, in which he suggested to Mr. Garrison that EMC would never pay the claim and that in contracting with the remediation subcontractors Raygarr was going to get stuck with the whole bill.

  E. John Patton (Insurance Claims Handling Process and Negligent
         Misrepresentation.)
    5903 E. Chuckwalla Trail
    Cave Creek, AZ 85331
    (312) 497-2104

John Patton is a Claims Administrator and Risk Manager with over 40 years of experience in property and casualty insurance and has been engaged to provide expert testimony in this matter.  It is Mr. Patton's opinion that EMC failed to act with reasonable care or competence in obtaining or communicating information to its insured, Raygarr, when it represented that Raygarr had a covered loss and consented to Raygarr entering into contracts with remediation subcontractors and with its continued handling of the claim. Mr. Patton is expected to testify consistent with his report dated on or about October 2, 2018, a copy of which is attached hereto.

F.      D.B. Udall (Insurance Bad faith and Fair Dealing expert)
        4801 E. Broadway Blvd., Ste 400
        Tucson AZ  85711
        520-623-4353

Mr. Udall is an attorney with over 60 years' experience in the area of insurance and a copy of his CV is attached. Based upon his review of EMC's claim file, it is his opinion that EMC acted in bad faith when it refused to honor the contracts that Raygarr had with the remediation contractors Abracadabra and ATI after EMC had authorized Raygarr to sign the contracts and proceed with the remediation work. Mr. Udall is expected to testify consistent with his report dated October 22, 2018, a copy of which is provided herewith.

G.      Christopher G Linscott – (Damages expert)
        Keegan Linscott & Kenon
        3443 N. Campbell Ave., Ste 115
        Tucson AZ  85719
        (520) 884-0176

Chris Linscott of Keegan Linscott & Kenon is a certified public accountant who was engaged to provide financial analysis in the matter of Raygarr, LLC v. Raytheon Missile

6

Systems Company and to provide expert testimony as to damages sustained Raygarr as a result of the actions of EMC. It is Mr. Linscott's opinion that Raygarr, LLC suffered damages in the form of annual lost profits of $107,762 beginning with September 9, 2014, through its corporate existence, and is expected to testify consistent with his report dated Febaian 15, 2017, his Supplemental and Expert Rebuttal Report dated March 27, 2019, **as well as his Addendum letter report dated June 10, 2019**, a copy of which is attached to this supplemental disclosure.

      H.     All witnesses identified by Defendant.

      I.     Dan Mischek – EMC Litigation Specialist
            c/o Broening Oberg Woods & Wilson
            2800 N Central Ave Ste 1600
            Phoenix, AZ 85004
            (602) 271-7767

Mr. Mischek was the Litigation Specialist assigned the Raygarr claim file from Fabian Mireles soon after the initial Notice of Claim. Mr. Mischek is expected to testify regarding his conversations and communications with Mr. Mireles and with Raygarr regarding the Claim as well as his understanding of the coverage isssues and EMC's handling of the Claim. Mr. Mischek is also expected to testify consistent with his deposition testimony taken December 12, 2018.

      J.     Nadine Mar – former EMC Claim Supervisor
            c/o Broening Oberg Woods & Wilson
            2800 N Central Ave Ste 1600
            Phoenix, AZ 85004
            (602) 271-7767

1       Nadine Mar was Claims Supervisor for EMC at the time of the incident from which

2    the Raygarr Claim arises. Ms. Mar is expected to testify as to what a customer may

3    reasonably expect from EMC given the events and circumstances as presented in this case,

4    and as consistent with her deposition testimony taken March 7, 2019.

5        **K.**     **Paul Kramkowski – Facilities Manager (deposition testimony 5/10/17)**

                  **Ty Ransdell – Project Manager (deposition testimony 8/17/17)**

6               **Nick Cajero - Facilities Manager (deposition testimony 5/9/17)**

7               **George Plentzas – Senior Project Manager (deposition testimony 4/12/17))**

                  **RAYTHEON COMPANY – Tucson Facility**

8               **c/o L. Michael Brooks**

                  **WELLS ANDERSON & RACE**

9               **1700 Broadway, Ste 1020**

10             **Denver CO 80290**

                  **(303) 830-1212**

11

12       Witnesses are Raytheon employees who are expected to testify consistent with

13    their deposition testimony from the prior Raytheon litigation (Pima County Case

14    C20160590) (see depo dates above), more particularly in regards to Raygarr's rate of

15    successful bidding, the quality of Raygarr's work, and the decision to not allow

16    Raygarr to continue to bid at Raytheon. In addition, Ty Ransdell, as Raytheon's

17    Project Manager, signed the Verification to and is expected to testify regarding

18    Raytheon's Response to Raygarr's 30(b)(6) Deposition by Written Questions, dated

19    June 6, 2019.

20        **L.**     **Rich Mendez (Retired) - Director of Properties**

21               **RAYTHEON COMPANY**

                  **c/o L. Michael Brooks**

22               **WELLS ANDERSON & RACE**

23             **1700 Broadway, Ste 1020**

                  **Denver CO 80290**

24             **(303) 830-1212**

25

26

8

**Rich Mendez served as Raytheon's Director of Properties, now retired, and is expected to testify consistent with his deposition taken April 25, 2017 in the prior Raytheon litigation, more particularly as to the damaging effect on a contractor when they don't get paid for work and cash flow is interrupted or removed.**

2.     State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses.   Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control.   If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

RESPONSE:

A.     Deposition of Raymond Garrison taken December 6, 2016;

B.     Deposition of Gregory Garrison taken December 5, 2016;

C.     Deposition of Ron Garrison taken March 2, 2017;

D.     Deposition of Nick Cajero taken May 9, 2017;

E.     Deposition of Chris Linscott taken May 15, 2017;

F.     **Deposition of Paul Kramkowski taken May 10, 2017;**

G.     **Deposition of Ty Ransdell taken August 17, 2017;**

H.     **Deposition of George Plentzas taken April 12, 2017;**

I.     **Deposition of Rich Mendez taken April 25, 2017;**

J.     In addition, a number of additional witness depositions were taken as part of Pima County Superior Court Case No. C20160590, including but not limited to various Raytheon personnel, which Plaintiff does not believe to be relevant to this matter, but are available for review upon request.

K.     In addition to the depositions above, Ron Garrison, Greg Garrison and Ray Garrison each gave trial testimony in the trial held November 28, 2017-December 7, 2017, in Case No. C20160590. It should be noted that transcripts of this testimony has not been ordered, but can be made available upon request.

L.     Affidavit of Ray Garrison (short) dated 8/30/17;

M.    Affidavit of Ray Garrison dated 8/30/17;

N.     1st Supplemental Affidavit of Ray Garrison dated 9/29/17;

O.     2nd Supplemental Affidavit of Ray Garrison dated 10/20/17;

P.     Affidavit of Gregory Garrison dated 9/21/17;

Q.     1st Supplemental Affidavit of Gregory Garrison dated 9/29/17;

R.     2nd Supplemental Affidavit of Gregory Garrison dated 10/20/17.

3.     List the documents, electronically stored information ("ESI"), tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names, and if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land or other property that are not in your possession, custody or control. For documents and tangible things in your possession, custody or control, you may produce them with your response, or make them available for inspection on the date of the response, instead of listing them. Production of ESI will occur in accordance with paragraph C.2 below.

**RESPONSE:**

A.     2/22/14 - EMC CGL Policy issued to Raygarr (Raygarr-000001-55);

B.      2/22/14 – EMC Umbrella Policy issued to Raygarr (Raygarr-000056-104);

C.      9/10/14 – Letter from EMC to Raygarr LLC (Raygarr-000105-106);

D.      9/15/14 – Fax transmittal from Raygarr to Fabian Mireles with copies of Certificates of Liability Insurance etc. (Raygarr-000107-124);

E.      9/23/14 - Letter from Dan Misheck to Dave Girard at Union Standard Insurance (Raygarr-0001256-126);

F.      9/23/14 – Letter from Mel Cohen to Fabian Mireles with billings statements following walk-through at Raytheon (Raygarr-000127-129);

G.      9/23/14 – Letter from Dan Misheck to Mel Cohen (Raygarr-000130-131);

H.      9/25/14 Email from Dan Misheck to Scott Bowker at FM Global with attachment (Raygarr-000132-136);

I.      10/2/14 – Letter from Mel Cohen to Dan Misheck (Raygarr-000137-138);

J.      10/14/14 – Letter from Mel Cohen to Dan Misheck (Raygarr-000139);

K.      10/17/14 – Letter from Mel Cohen to Jonathan Sullivan (Raygarr-000234-235);

L.      11/5/14 – Letter from Mel Cohen to John Elardo (Raygarr-000140-141).

M.      11/13/14 – Letter from Mel Cohen to John Elardo (Raygarr-000142-143);

N.      11/19/14 – Letter from Mel Cohen to John Elardo (Raygarr-000144-145);

O.      11/26/14 – Letter from Mel Cohen to John Elardo (Raygarr-000146-147);

P.      1/15/15 – Letter from John Elardo to Mel Cohen (Raygarr-000148-154);

Q.      3/23/15 – Letter from Mel Cohen to John Elardo (Raygarr-000155-162);

R.      5/01/15 – Letter from John Elardo to Mel Cohen (Raygarr-000163-167);

S.      5/22/15 – Letter from Mel Cohen to John Elardo with attachments (Raygarr-000168-221);

T.      6/16/15 – Letter from John Elardo to Mel Cohen (Raygarr-000222-224);

11

U.      7/15/2015 – Email from Mel Cohen to John Elardo and John Kastner with Raygarr Claim Letter of July 13, 2015; (Raygarr-000236-241)

V.      9/04/15 – Letter from Spencer Smith to Fabian Mireles (Raygarr-000225-226);

W.      3/10/16 – Letter from John Elardo to Mel Cohen (Raygarr-000227-233);

X.      Affidavits of Ray Garrison and Greg Garrison (see ¶2.H-N above) (Raygarr-000242-299);

Y.      Damages Summary and supporting documentation (Raygarr-000300-578);

Z.      Any and all documents identified in disclosure statements from any and all parties in the litigation brought against Raygarr by Raytheon (C20160590), and not already destroyed pursuant to the Court's Protective Order in that case. These documents are available for review upon request.**

AA.    Documents produced in response to EMC's 1st Set of Non-Uniform Interrogatories and 1st Set of EMC's Request for Production and identified as Raygarr-00579-728, as well as Bank Statements identified as RAYGARR002018-2057, RAYGARR002074-2091, and RAYGARR002130-2143.

BB.    29 Mechanics' Liens recorded by against Raygarr and Raytheon between December 2014 and August 2015 (Raygarr-00729-01086);
         a.  Flooring Systems of Arizona (8);
         b.  Liberty Fencing and Drywall;
         c.  Babby Henkel Building Specialties (12);
         d.  Abracadabra Restoration;
         e.  Miner Southwest;
         f.  JB Ventures dba JB Steel;
         g.  Commonwealth Electric Company (3);
         h.  API Systems Group;
         i.  Faulk Electric.

CC.    Expert Report of Chris Linscott dated February 15, 2017 (Raygarr-01087-01106);

a. Expert Rebuttal Report of Chris Linscott dated March 27, 2019 (Raygarr-01194-1206) and previously produced on March 28, 2019;

b. **Addendum letter report of Chris Linscott dated June 10, 2019 *(Raygarr-01397-1398)*.**

DD.   Expert Report of John Patton with CV and billing rates (Raygarr-01107-01116);

EE.   Expert Report of D.B. Udall dated October 22, 2018 with CV and billing (Raygarr-01117-01124).

FF. Documents produced on 1/9/19, in response to EMC's 2nd Request for Production, including documents disclosed in prior litigation with Raytheon and identified as:

a. Raygarr 00001-00726 – Raygarr IDS Documents;

b. RAYGARR001818-2091 – 2014 bank records (redacted);

c. RAYGARR002092-2257 – 2015 bank records (redacted);

d. RAYGARR002258-2336 – 2014 Ledger;

e. RAYGARR002362-2369 – 2014 Tax Return (redacted);

f. RAYGARR002370-2374 – 2015 Tax Return (redacted);

g. RAYGARR002406-2407 – Raygarr Deposits and Loans;

h. RAYGARR002408-2409 – Raygarr LLC P&L;

i. RAYGARR002410-2415 – Raygarr Transaction Report;

j. RAYGARR002683-3748 – 842 Water Damage Files;

k. RAYGARR003747-3748 – Raygarr Bid Schedule;

l. RAYGARR004119-4122 – Updated 2013-2014 Win-Loss Bid Performance;

m. RAYGARR002417-3789 - Raygarr Loan Info;

n. RMS 431-877 – Raytheon-Raygarr POs;

1           o. Counterclaimant Raygarr's 7th Suppl DS from Case C20160590;

2           p. Raytheon's 5th Suppl DS and all Raytheon's Objections and Responses to

3             Discovery Requests; including Privilege Log, disclosed by Raytheon in the

4             prior litigation (CaseNo C20160590);

5    GG.   Keegan Linscott and Kenon files (Raygarr-KLK 000001-74), produced on

6      1/9/19, in response to EMC's 2nd Request for Production;

7           a. Raygarr-KLK 000075-110 - 2010-2015 Tax Returns (redacted), produced

8             with this disclosure as a supplemental response to EMC's 2nd Request for

9             Production.  Keegan Linscott & Kenon (KLK) mistakenly believed they

10           retained only electronic files from Raygarr which were produced on 1/9/19

11           in response to EMC's 2nd Request for production. Only recently did KLK

12           discover additional hard copy documents, which are disclosed and

13           produced herewith.

14           b. Raygarr-KLK 000111-122 – Flood Expenses work papers and 2013-2014

15             Raygarr Income Statements (Cash Bases), produced pursuant to request in

16             Chris Linscott's deposition (see also KK below).

17    HH.   All Deposition Transcripts from prior litigation, not already in EMC

18      possession or otherwise destroyed pursuant to Raytheon Protective Order,

19      previously produced on 1/9/19 and 3/14/19 in response to EMC's 2nd Request for

20      Production.

21    II.  Schedule of Subcontractor payments by Raygarr from September 2014 through

22      close of business in October 2015, disclosed in prior litigation with Raytheon

23      (Case C20160590) (identified in this litigation as Raygarr-01125-1131 - copy

24      enclosed with this 3rd Suppl DS);

25

26

JJ. EMC Insurance Group, Inc. - Form 10-Q – Quarterly Report for period ending 9/30/18 (Raygarr-01132-1193), as well as any future 10-Q quarterly reports as they become available within the public record;

KK.   Documents produced herewith in response to questions raised by Counsel during Chris Linscott deposition:

    a.  Stipulation Requesting Court Order Directing Payments to Be Made From Interpleaded Funds, dated April 19, 2017 (Case No. C2015 0845 – R.E. Lee Mechanical Contracting, Inc. v Raygarr, LLC; and Raytheon Company, see Footnote 1 on Page 2.) - $75,390.83. (*Raygarr-01207-1212.*)

    b.  Raygarr Docs evidencing 14% markup on Raytheon projects and Change Orders in 2014 (*Raygarr-01213-1226*);

    c.  Raygarr – 842 Restoration Manpower Schedule – Tentative (*Raygarr-1227*);

    d.   Additional time records for 842Flood (*Raygarr-01228-1263*);

    e.  Raygarr's Daily Records (identified in prior litigation as RAYGARR001781-1817);

LL.   Raytheon Summary of Damages (RMS 3401-3403); and

MM.   Raytheon Claims for Set off (RMS 3566)

NN.   **Additional Correspondence between MCR and John Elardo between December 2014 and September 2017, as set forth below:**

    a.  **2014-12-01 Email from John Elardo to Mel Cohen *Raygarr-01264-1267*;**

    b.  **2014-12-19 Letter from Mel Cohen to John Elardo with attached Raytheon letter and enclosures dated 12/16/14.   Note: this letter was previously identified with bates number *Raygarr-000714-728*,**

produced with Raygarr's Response to EMC's 1st RFP #1 and 1st Supplemental Disclosure on or about August 17, 2018 (see AA. above);

   c.  2014-12-30 Letter from Mel Cohen to John Elardo (*Raygarr-01268*);

   d.  2015-01-06 Email and Letter from John Elardo to Mel Cohen (*Raygarr-01269-1274*);

   e.  2015-01-26 Email and Letter from Mel Cohen to John Elardo, with attachments (*Raygarr-01275-1359*);

   f.  2015-04-09 Letter from Mel Cohen to John Elardo (*Raygarr-01360*);

   g.  2015-04-24 Email from MCR to John Kastner and John Elardo (email only) (*Raygarr-01361*);

   h.  2015-09-03 Email and attachments from MCR to John Kastner and John Elardo (*Raygarr-01362-1368*);

   i.  2016 Email correspondence with John Elardo re 2016 Tolling Agreement (*Raygarr-01369-1377*);

   j.  2017-01-23 Emails between John Elardo and Mel Cohen (*Raygarr-01378-1379*);

   k.  2017-05-01 Email from John Elardo to John Kastner, Mel Cohen and PJ Lopez (*Raygarr-01380*);

   l.  2017 Email correspondence with John Elardo re 2017 Tolling Agreement (*Raygarr-01381-1385*);

OO.  Tolling Agreement between Raygarr and EMC dated 9/8/16 (*Raygarr-01386-1391*);

PP.  Amended Tolling Agreement dated 9/8/17 (*Raygarr-01392-1396*);

QQ.  Raytheon's Response to Raygarr's Subpoena for 30(b)(6) Deposition by Written Question, response dated June 6, 2019 (*Raygarr-RaytheonSDT 00001-00010*)

16

RR.   **Phone Records of Fabian Mireles for months of September and October 2014, responsive to Raygarr's 2nd Request for Production of Documents to EMC dated May 24, 2019. (Response still pending)**

\*\*As a condition of this disclosure, if any document is inadvertently disclosed in this matter that is required to be Confidential or destroyed pursuant to the Court's Protective Order entered in the litigation with Raytheon (C20160590), the document must be returned to Plaintiff's counsel, with no copies made or retained.

4.   For each of your claims or defenses, state the facts relevant to it and the legal theories upon which it is based.

**RESPONSE:**

On September 8, 2014, Raygarr's plumbing subcontractor Qualified Mechanical Contractors was performing work on a bathroom remodel project in Raytheon Building 842 at the Raytheon airport campus. Raytheon awarded the Building 842 bathroom-remodel project to Raygarr, who subcontracted with Qualified Mechanical to perform necessary plumbing work on the remodel project. On the night of September 8/9, 2014, temporary PVC caps placed on pipes in the bathroom failed, and water leaked from these pipes throughout the night. At 6:30 a.m., Raytheon calls Raygarr for the first time and informs that Building 842 is flooded. Raytheon told Raygarr that temporary PVC caps failed on its project and that Raygarr caused the flood. According to Raytheon, the flood to Building 842 caused several millions of dollars in damages to Raytheon property. When Greg Garrison was notified of the flood, he contacted Raygarr's insurance agent, Ryan Trayers. Trayers contacted the insurance carrier, EMC, and a claim was opened. EMC assigned senior claims adjuster Fabian Mireles to handle the claim.

Based on the representations of Raytheon on the morning of September 9, Raygarr took the lead with the remediation efforts of Building 842. On September 9 or 10, the flood

1    remediation contractors that were called out—Abracadabra and ATI—approached Raytheon
2    to have Raytheon sign their contracts. Raytheon declined to sign them and instead directed
3    Abracadabra and ATI to have Raygarr sign them. ATI approached Ron Garrison and wanted
4    Ron to sign the contract for Raygarr. Ron refused to sign ATI's contract until he first
5    obtained approval from his brother, Ray Garrison, the owner of Raygarr. Abracadabra
6    approached Ray Garrison to get Ray to sign for Raygarr.

7        The remediation costs were likely to exceed $1 million and Ray knew that. Ray
8    Garrison was not going to sign contracts he knew his company had no ability to pay without
9    first getting approval from his insurance carrier, EMC. Raygarr would have to rely entirely
10   on insurance coverage to pay ATI and Abracadabra if Raygarr entered into those contracts.

11       Before agreeing to sign the remediation contracts, Ray called Fabian Mireles, the
12   EMC senior claims adjuster assigned to this claim. After fully informing Mireles of the
13   nature and extent of the flooding in Building 842, and all the facts that Ray knew at the time
14   concerning the loss, Ray informed Mireles that Abracadabra and ATI wanted Raygarr to
15   sign their contracts. Ray wanted assurance from EMC that Raygarr was covered, and
16   direction from EMC concerning whether Raygarr can proceed with signing the contracts.

17       Raygarr's policy with EMC includes Section IV – Commercial General Liability
18   Conditions. Section IV(2)(d) provides: "No insured will, except at that insured's own cost,
19   voluntarily make a payment, assume any obligation, or incur any expense, other than for
20   first aid, without our consent." After notice and disclosure to Mireles, Mireles told Ray that
21   Raygarr was covered and could proceed with entering into the contracts with ATI and
22   Abracadabra. Relying on the consent given by Mireles, Ray signed the contract with
23   Arbracadabra, and Ray informed Greg that he could sign the contract with ATI. Greg,
24   therefore, signed the contract with ATI for Raygarr.

25       As Raygarr received bills for the remediation effort, those bills were tendered to
26   EMC. EMC refused to pay the bills. Despite the representations of Mireles, EMC later

determined that it would not cover the loss and pay for the remediation costs. EMC refused to pay ATI or Abracadabra or any other flood remediation costs which were over $1.5 million in total.

Because neither EMC nor Raytheon would pay for the costs of the remediation, Raygarr was forced to enter into a "factoring agreement" with a private hard-money lender to obtain cash to make what payments it could to contractors and subcontractors. ATI, Abracadabra, and other subcontractors that Raygarr could not pay because of the refusal of EMC to cover the loss as it had previously represented, either sued Raygarr for non-payment or filed Registrar of Contractor's complaints for Raygarr's failure to timely pay its contractual obligations—contracts Raygarr entered into in complete reliance on the representations of Mireles. Furthermore, because EMC did not pay the costs of a flood remediation that Raygarr had informed Raytheon that EMC said it would pay, Raytheon terminated Raygarr as a contractor for Raytheon, forcing Raygarr out of business.

Because of EMC's representation of coverage, Raygarr contractually obligated itself to the remediation contractors and amassed enormous debt that it could not pay. These facts support the following claims:

**Negligent Misrepresentation.**

Arizona courts have recognized the tort of negligent misrepresentation since *Van Buren v. Pima Community College District Board*, 113 Ariz. 85, 87, 546 P.2d 821, 823 (1976). Negligent misrepresentation claims are governed by Restatement (Second) of Torts section 552. *Donnelly Construction Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 188, 677 P.2d 1292, 1296 (1984). And in *Donnelly* and later cases, Arizona courts have repeatedly accepted § 552(2) as defining the range of liability for such claims. *See Id.* at 189, 677 P.2d at 1297 10; *Hoffman v. Greenberg*, 159 Ariz. 377, 379-80, 767 P.2d 725, 727-28 (App. 1988); *Western Technologies v. Sverdrup & Parcel, Inc.*, 154 Ariz. 1, 739 P.2d 1318, 1320 (App. 1986).

1    Restatement (Second) of Torts section 552 states:

2    One who, in the course of his business, profession or employment, or in any other

3    transaction in which he has a pecuniary interest, supplies false information for the guidance

4    of others in their business transactions, is subject to liability for pecuniary loss caused to

5    them by their justifiable reliance upon the information, if he fails to exercise reasonable care

6    or competence in obtaining or communicating the information.

7    The tort of negligent misrepresentation, as defined in section 552, encompasses

8    negligence both in gathering and communicating information. See RESTATEMENT

9    (SECOND) § 552 cmt. e ("The defendant is subject to liability if . . . he has failed to

10   exercise the care or competence of a reasonable man in obtaining or communicating the

11   information.")(emphasis added); Standard Chtd. PLC v. Price Waterhouse, 190 Ariz. 6, 31,

12   945 P.2d 317, 342 (App. 1996).

13   On this claim, Raygarr must prove:

14   1.   EMC either provided Raygarr with false or incorrect information, or omitted or

15   failed to disclose material information;

16   2.   EMC intended that Raygarr rely on information provided and EMC provided it

17   for that purpose;

18   3.   EMC failed to exercise reasonable care or competence in obtaining or

19   communicating the information;

20   4.   Raygarr relied on the information;

21   5.   Raygarr's reliance was justified; and

22   6.   As a result, Raygarr was damaged.

23   *McAlister v. Citibank*, 171 Ariz. 207, 829 P.2d 1253 (App. 1992); *Murray Mgmt. Corp. v.*

24   *Founders Title Co.*, 169 Ariz. 417, 819 P.2d 1003 (App. 1991); *St. Joseph's Hosp. & Med.*

25   *Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 742 P.2d 808 (1987); *Van Buren v. Pima*

26   *Community College Dist. Bd.*, 113 Ariz. 85, 546 P.2d 821 (1976); *RESTATEMENT*

20

1  *(SECOND) OF TORTS* § 552(1) (1977); *Alaface v. Nat'l Inv. Co.*, 181 Ariz. 586, 892 P.2d

2  1375 (App. 1994).

3

4  **Negligence.**

5  The elements of a negligence claim are:

6  (a)  a duty requiring the defendant to conform to a certain standard of care;

7  (b)  a breach by the defendant of that standard;

8  (c)  a causal connection between the defendant's conduct and the resulting injury;

9  and

10  (d)  damages.

11

12  **Promissory Estoppel.**

13  Raygarr claims that EMC should be bound by EMC's promise that the flood was a

14  covered loss and that Raygarr could proceed with entering into contracts for the flood

15  remediation. On this claim, Raygarr must prove:

16  1.  EMC made such a promise;

17  2.  It was reasonably foreseeable to EMC that Raygarr would rely upon that promise;

18  3.  Raygarr justifiably relied upon the promise; and

19  4.  Raygarr incurred loss or suffered detriment as the result of such reliance.

20  *Contempo Constr. Co. v. Mountain States T. & T. Co.*, 153 Ariz. 279, 282, 736 P.2d 13, 16

21  (1987); *Trollope v. Koerner*, 106 Ariz. 10, 18, 470 P.2d 91, 99 (1970) (reliance must be

22  justified). See also RESTATEMENT (SECOND) OF CONTRACTS § 90.

23

24  **Insurance Bad Faith/Breach of the Covenant of Good Faith And Fair Dealing.**

25  There is a covenant of good faith and fair dealing inherent in every contract which

26  requires that "neither party act to impair the right of the other to receive the benefits which

21

1    flow from their agreement or contractual relationship." *Rawlings v. Apodaca*, 151 Ariz. 149,

2    153-54, 726 P.2d 565, 569-70 (1986). Rawlings is a case in which the Arizona Supreme

3    Court dealt with the covenant of good faith in the context of an insurance contract. *Id*. In

4    Rawlings, the court held that "one of the benefits that flow from [an] insurance contract is

5    the insured's expectation that his insurance company will not wrongfully deprive him of the

6    very security for which he bargained." *Id*. @ 155. "Conduct by the insurer which does

7    destroy the security . . . breaches the implied covenant of good faith and fair dealing implied

8    in the contract." *Id*.

9          To prove that Defendant EMC breached the duty of good faith and fair dealing,

10    Raygarr must prove:

11          1.   EMC intentionally denied the claim or failed to pay the claim or delayed payment

12    of the claim without a reasonable basis for such action; and

13          2.   EMC knew that it acted without a reasonable basis, or EMC failed to perform an

14    investigation or evaluation adequate to determine whether its action was supported by a

15    reasonable basis.

16          Moreover, in all aspects of investigating or evaluating a claim, EMC is required to

17    give as much consideration to Raygarr's interests as it does to its own interests. *Rawlings v.*

18    *Apodaca*, 151 Ariz. 149, 157, 726 P.2d 565, 573 (1986).

19

20    **Breach of Contract**.

21          The elements of a breach of contract claim are:

22          (a)  the existence of a contract;

23          (b)  breach; and

24          (c)  resulting damage.

25    *Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975).

26

1   5.   Provide a computation of each category of damages claimed by you, and a

2   description of the documents or other evidentiary material on which it is based, including

3   materials bearing on the nature and extent of the injuries suffered.  You may produce the

4   documents or other evidentiary materials with your response instead of describing them.

5   **RESPONSE**:

6   See Exhibit A to Chris Linscott Expert Rebuttal Report dated 3/27/19;

7

8   Plus Attorneys' fees and costs pursuant to A.R.S. §12-341.01 and A.R.S. §32-

9   1129.01(M); and Pre-Judgment Interest pursuant to A.R.S. §32-1129.01(K), 1.5

10   percent per month.

11

12   6.   Specifically identify and describe any insurance or other agreement under

13   which an insurance business or other person or entity may be liable to satisfy all or part of a

14   possible judgment in the action or to indemnify or reimburse a party for payments made by

15   the party to satisfy the judgment.  You may produce a copy of the agreement with your

16   response instead of describing it.

17

18   **RESPONSE**:  See CGL and Umbrella Policies identified in 3A and 3B above.

19

20   DATED: June _18_, 2019.

21   MESCH CLARK ROTHSCHILD

22   By: _____

23   Melvin C. Cohen
    Patrick J. Lopez

24   *Attorneys for Plaintiff*

25

26

1    Copy mailed and emailed on
     June __10__, 2019, to:

2

3    Alicyn M. Freeman  amf@bowwlaw.com
     Robert T. Sullivan   rts@bowwlaw.com

4    BROENING OBERG WOODS & WILSON PC
     2800 N Central Ave., Suite 1600

5    Phoenix AZ  85004

6    *Attorneys for Defendant*

7

8    _____
     26A2023

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT B

1          Q.   Okay.  Well, it's an important

2     distinction for the purpose of our case.

3               So do you understand that there's a

4     difference between best practices and the standard of

5     care?

6                    MR. ROTHSCHILD:  Form.  Foundation.

7                    THE WITNESS:  Yes.

8          Q.   BY MS. FREEMAN:  Okay.  So you can as an

9     insurance company or adjuster act reasonably within

10    the standard of care without following the best

11    practices.  Do you agree with that?

12         A.   I'm not sure I do.

13         Q.   Okay.  Is it your opinion that the

14    standard of care is the best practices?

15         A.   No.  Because, first of all, I guess,

16    maybe I've been away from the active business for a

17    long time, because I've never heard standard of care

18    associated with insurance company.

19         Q.   Okay.  Well, let's use the word

20    reasonable.  Right?

21         A.   Pardon me?

22         Q.   Let's use the word reasonable.

23         A.   Okay.

24         Q.   Reasonable care.  Okay.  Is that a fair

25    term to use?

Page 158

1          A.   Sure.

2          Q.   Okay.  Is it your opinion that the -- in

3     order to act reasonably, an insurance carrier has to

4     follow the best practice?

5          A.   Yes.

6          Q.   Okay.  The gold standard, right?

7          A.   Yes.

8               MR. ROTHSCHILD:  Form.  Foundation.

9          Q.   BY MS. FREEMAN:  So if an insurance

10    carrier does not follow that gold standard, best

11    practices in your opinion, they have fallen below --

12    they've not acted reasonably?

13         A.   Correct.

14         Q.   Okay.  And in your experience in the

15    industry, you have written some of those gold

16    standard best practices?

17         A.   Correct.

18         Q.   And as you give your opinion of what

19    should have happened in this case and what

20    Mr. Mireles should have done, you're using your

21    experience of creating those gold standard best

22    practices to say Mr. Mireles should have been

23    following those?

24               MR. ROTHSCHILD:  Form.  Foundation.

25               THE WITNESS:  It's both that and audits

Page 159

1    that I've performed on insurance companies based on

2    their best practices to see if they meet their own

3    standards.  So it's everything.  It's not just mine.

4         Q.   BY MS. FREEMAN:  It's not just the ones

5    that you've created?

6         A.   No.

7         Q.   You've been exposed to best practice gold

8    standards at different insurance companies?

9         A.   Correct.

10        Q.   And so when we talked today about what in

11   your opinion Mr. Mireles was required to do, those

12   were all those best practices gold standard-type

13   practices?

14             MR. ROTHSCHILD:  Form.  Foundation.

15             THE WITNESS:  Yes.

16        Q.   BY MS. FREEMAN:  Can I just go through my

17   notes real quick and let you know if I have any

18   others for you?

19             Did you do any independent research?

20        A.   No.  Go look at ISO online, no.

21             MS. FREEMAN:  Okay.  That's all the

22   questions I have.  I went over my two hours, so I

23   think I owe you another check.  We're at 1 o'clock,

24   so I will send you one for another hour, if that

25   works for you.